UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
*In re*:

WINDSTREAM HOLDINGS, INC. *et al.*,

                    Debtors.
----------------------------------------------------------------------x
WINDSTREAM HOLDINGS, INC. *et al.*,

                Plaintiffs-Appellees,

    - against -

CHARTER COMMUNICATIONS INC. and
CHARTER COMMUNICATIONS OPERATING, LLC,

               Defendants-Appellants.

----------------------------------------------------------------------x

**OPINION AND ORDER**

No. 21-CV-4552 (CS)

<u>Appearances</u>:
Terence P. Ross
Shaya Rochester
Robert T. Smith
Eric T. Werlinger
Timothy H. Gray
Katten Muchin Rosenman LLP
New York, New York
Washington, D.C.
*Counsel for Plaintiffs-Appellees*

Susheel Kirpalani
Benjamin I. Finestone
Quinn Emanuel Urquhart & Sullivan, LLP
New York, New York
*Counsel for Defendants-Appellants*

<u>Seibel, J.</u>

      Before the Court is the appeal of Defendants-Appellants Charter Communications Inc.

and Charter Communications Operating, LLC (together, "Charter") from the Bankruptcy Court's

April 15, 2021 judgment holding Charter in contempt for violation of the automatic stay under

11 U.S.C. § 362(a) and assessing sanctions (the "Judgment").  (Bankr. Dkt. 334.)[1]  For the

following reasons, the Judgment is VACATED in part.[2]

I.     **BACKGROUND**

Plaintiffs-Appellees Windstream Holdings Inc. and its debtor affiliates (collectively,

"Windstream") and Charter are telecommunications service providers.  (Bankr. Dkt. 1 ("Adv.

Compl.") ¶¶ 11-12.)  Windstream filed for Chapter 11 reorganization on February 25, 2019.  (*Id.*

¶ 14.)  By operation of 11 U.S.C. § 362, the automatic stay went into effect on that date.

Charter competes with Windstream in providing residential and commercial voice and

data communication services in certain locations.  (*Id.* ¶¶ 11-13.)  In March 2019, Charter

launched a direct-mail advertising campaign directed at Windstream customers.  (*Id.* ¶¶ 18-19.)

The initial mailing had text on the front of the envelope that stated:  "Important Information

Enclosed for Windstream Customers."  (Bankr. Dkt. 341-7.)  Inside was a two-sided

advertisement for Spectrum (which is Charter's residential internet brand).  (Bankr. Dkt. 341-6 at

1-2.)  Text on the front of the ad stated in large text:  "Windstream Customers, Don't Risk

Losing Your Internet and TV Services."  (*Id.* at 1.)  In smaller text below that, the advertisement

read (in relevant part):  "Windstream has filed for Chapter 11 bankruptcy, which means

---

[1] References to "Bankr. Dkt." refer to documents filed on the docket in the underlying adversary proceeding in the Bankruptcy Court for the Southern District of New York under docket number 19-8246.  References to "ECF No." are to documents filed on this Court's docket.

[2] Charter appeals only the Bankruptcy Court's contempt ruling with respect to the claim that its advertising campaign violated the automatic stay, and does not challenge that Court's holdings that:  (1) its termination of "last mile" service to Windstream customers – in violation of the parties' Value Added Reseller ("VAR") Agreement – violated the automatic stay; or (2) its unsecured claims should be equitably subordinated.  (*See* ECF No. 15 ("Appellants' Mem.") at 15 n.3.)

uncertainty.  Will they be able to provide the Internet and TV services you rely on in the future?  To ensure you are not left without vital Internet and TV services, switch to Spectrum. . . . Windstream has a 2-year contract.  With Spectrum there are no contracts.  Plus, we will buy you out of your current contract up to $500." (*Id.*)  The back of the advertisement stated, among other things, "Windstream's future is unknown, but Spectrum is here to stay . . . ." (*Id.*)  Windstream alleges that this advertising was knowingly false, in that Charter was aware that Windstream's bankruptcy was not going to result in any interruption of service to its customers.  (Adv. Compl. ¶¶ 3-4.)

Charter mailed this advertisement to 800,000 residences in geographic markets that it determined were likely to include Windstream subscribers.  (*See* Bankr. Dkt. 343-35 at 26:6-14, 32:13-33:9.)  At trial, Windstream introduced evidence and testimony that the advertisement caused confusion among its customers, (*see, e.g.*, Bankr. Dkt. 341-26 at 11:19-14:14, 25:15-26:21; Bankr. Dkt. 328 at 37:4-8), and caused it to lose several thousand customers, (*see* Bankr. Dkt. 343-27 ¶¶ 17-19; Bankr. Dkt. 343-28 ¶ 20; *see also* Bankr. Dkt. 328 at 57:23-58:7).  Windstream also introduced evidence that it offered credits and discounts, (Bankr. Dkt. 343-27 ¶¶ 12-14; Bankr. Dkt. 342-55), launched a corrective advertising campaign, (Bankr. Dkt. 343-27 ¶ 16; Bankr. Dkt. 342-13; Bankr. Dkt. 342-14), and later launched an additional promotional campaign, (Bankr. Dkt. 328 at 48:5-15, 56:3-23, 109:11-110:12; Bankr. Dkt. 343-27 ¶ 15; Bankr. Dkt. 342-53), all to mitigate the impact of this advertising on its business.

On April 5, 2019, Windstream initiated an adversary proceeding before the Bankruptcy Court, bringing seven claims.  (Adv. Compl.)[3]  On the same day it sought a temporary

---

[3] Counts I-IV in the Adversary Complaint alleged violations of the Lanham Act and its Georgia, North Carolina, and Nebraska equivalents; Count V alleged breach of contract based on

restraining order and preliminary injunction against Charter's advertising campaign.  (Bankr. Dkt. 2.)  On April 16, 2019, the Bankruptcy Court granted Windstream's request for a temporary restraining order and enjoined the direct mail campaign, (Bankr. Dkt. 25), and on May 16, 2019 issued the requested preliminary injunction providing the same relief, (Bankr. Dkt. 61).

On October 9, 2019, Charter filed in this Court a motion to withdraw the reference on Counts I through V of the Adversary Complaint.  (No. 19-CV-9354, ECF No. 1; Bankr. Dkt. 104.)  On October 14, Charter filed in the Bankruptcy Court a motion for judgment on the pleadings on Count VI of the Adversary Complaint and a motion to dismiss Count VII.  (Bankr. Dkt. 109.)  On November 15, 2019, while Charter's motion to withdraw the reference as to Counts I through V was pending, the parties filed cross-motions for summary judgment in the Bankruptcy Court:  Charter moved for summary judgment on Counts I through V, (Bankr. Dkt. 129), and Windstream moved for summary judgment on all counts, (Bankr. Dkt. 122).  On December 18, 2019, the Bankruptcy Court held a hearing on the parties' motions and issued rulings from the bench, including denying Charter's motion for summary judgment, (Bankr. Dkt. 237 ("SJ Hr'g") at 132:6-156:9; *see* Bankr. Dkt. 275); denying Charter's motion for judgment on the pleadings as to Count VI and denying in part and granting in part Charter's motion to dismiss Count VII, (SJ Hr'g at 54:8-61:10; *see* Bankr. Dkt. 259); granting Windstream's motion for summary judgment on Counts I-V as to liability (SJ Hr'g at 136:24-151:21); and granting in part and denying in part Windstream's motion for summary judgment on Counts VI-VII, (*id.* at 151:22-154:24; *see* Bankr. Dkt. 274).  With respect to Count VI, the Bankruptcy Court determined that Charter was liable for violating the automatic stay through its advertising

---

the VAR Agreement; Count VI alleged violations of the automatic stay; and Count VII sought equitable subordination.  (*See* Bankr. Dkt. 1; Bankr. Dkt. 41.)

campaign, which the Bankruptcy Court described as "an act to control property of the estate, namely, the debtors' customers or contracts with those customers."  (SJ Hr'g at 152:7-14.)[4]  The Bankruptcy Court did not determine damages at that time, explaining that disputed facts remained as to "whether the actions taken as alleged in the motion and the complaint in violation of the stay would satisfy the standard for civil contempt as most recently articulated by the Supreme Court in the *Taggart* case."  (*Id.* at 135:23-136:23.)[5]

In May 2020, the Bankruptcy Court held a four-day trial on Counts VI and VII to determine, as relevant to this appeal, whether Charter should be held in contempt for violation of the automatic stay and, if so, what sanctions should be imposed.  On April 8, 2021, the Bankruptcy Court issued a memorandum of decision (the "Order") noting its prior summary judgment rulings as to Counts VI and VII and setting out its decisions on the remaining issues on those counts.  (*See* Bankr. Dkt. 332.)  As relevant to this appeal, the Order noted the Bankruptcy Court's previous holding that Charter had breached the automatic stay by its "literally false and intentionally misleading advertising campaign that wrongfully interfered with the Debtors' customer contracts and goodwill" and held that Charter should be (1) held in contempt for that violation and (2) sanctioned $19,179,329.45 for the losses caused thereby.  (Order at 3.)  On

---

[4] Specifically, the Bankruptcy Court stated that the conduct that it had found to violate the Lanham Act and similar state laws also violated the automatic stay:

> [T]he violation of the Lanham Act and its state law equivalents is an act to control property of the estate, namely, the debtors' customers or contracts with those customers, which would also constitute a violation of the automatic stay, given that those rights are protected by the automatic stay. . . .  [T]he automatic stay was violated by . . . interference with the Windstream entities' contracts with their customers by the mailing campaign.

(SJ Hr'g at 152:7-19.)

[5] The Bankruptcy Court was referring to *Taggart v. Lorenzen*, 139 S. Ct. 1795 (2019).

April 15, 2021, the Bankruptcy Court entered Judgment on Counts VI and VII of the Adversary Complaint in favor of Windstream.  (Bankr. Dkt. 334.)  On April 29, 2021, Charter timely filed a notice of appeal.  (Bankr. Dkt. 337.)

## II.    LEGAL STANDARD

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a)(1) to hear appeals from final judgments, orders, and decrees of a bankruptcy court.  "Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*." *R²Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns Inc.)*, 691 F.3d 476, 482-83 (2d Cir. 2012).  The Court reviews *de novo* the bankruptcy court's legal conclusion that Charter violated the automatic stay.  *Bank of Am., N.A. v. Adomah (In re Adomah)*, 368 B.R. 134, 137 (S.D.N.Y. 2007).

"When reviewing for clear error, [the Court] may reverse only if [it is] left with the definite and firm conviction that a mistake has been committed." *United States v. Bershchansky*, 788 F.3d 102, 110 (2d Cir. 2015) (cleaned up).  "Thus, if the factual findings of the bankruptcy court are plausible in light of the record viewed in its entirety, this Court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Savage & Assocs., P.C. v. Williams Commc'ns (In re Teligent Servs., Inc.)*, 372 B.R. 594, 599 (S.D.N.Y. 2007) (cleaned up).  "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (cleaned up).

"On appellate review, this Court may set aside a bankruptcy court's order holding a party in contempt only for abuse of discretion, but such review is more exacting than under the ordinary abuse-of-discretion standard because a bankruptcy court's contempt power is narrowly circumscribed." *Blair Ventures, LLC v. Famous Restoration Inc. (In re Blair Ventures)*, 581

B.R. 728, 732 (S.D.N.Y. 2017) (cleaned up). A bankruptcy court's award of sanctions is also subject to an "abuse of discretion" standard. *Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 91 (2d Cir. 2010). A bankruptcy court "abuses its discretion if it (1) bases its decision on an error of law or uses the wrong legal standard; (2) bases its decision on a clearly erroneous factual finding; or (3) reaches a conclusion that, though not necessarily the product of a legal error or a clearly erroneous factual finding, cannot be located within the range of permissible decisions." *Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 627 (2d Cir. 2018) (cleaned up).

## III.   DISCUSSION

The Court addresses in this opinion whether (1) Charter's advertisements violated the automatic stay and (2) the Bankruptcy Court properly held that there was no fair ground of doubt that the advertisements would violate the stay, such that civil contempt sanctions were appropriate. Because I find that Charter's advertisements did not violate the automatic stay, and in any case, there was a fair ground of doubt whether they did so, I do not address any other issue presented on this appeal.[6]

### A.   Whether the Bankruptcy Court Erred in Holding that Charter Violated the Automatic Stay

"The Bankruptcy Code's automatic stay provisions, set forth in Section 362, protect bankruptcy estates by restraining any formal or informal action or legal proceeding that might dissipate estate assets or interfere with the trustee's orderly administration of the estate." *Bayview Loan Servicing LLC v. Fogarty (In re Fogarty)*, 39 F.4th 62, 71 (2d Cir. 2022) (cleaned

---

[6] Specifically, I need not and do not address whether Charter violated the Lanham Act or its state law equivalents, nor do I address the Court's findings as to the appropriate quantum of damages. My reversal of the contempt finding will not leave Windstream without a remedy, as it still may pursue its false advertising and breach of contract claims as to which I have withdrawn the reference.

up).  Upon the filing of a bankruptcy petition, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" is automatically stayed.  11 U.S.C. § 362(a)(3); *see Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 776 (2d Cir. 1992) ("Section 362 of the Code operates, immediately upon a debtor's filing of a bankruptcy petition, to, *inter alia*, stay automatically any act to transfer control over property of the estate.").  Under 11 U.S.C. § 541(a)(1), "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  Such interests include a debtor's interest in executory contracts, *see Lehman Bros. Special Fin. Inc. v. Bank of Am. Nat'l Ass'n (In re Lehman Bros. Holdings Inc.)*, 544 B.R. 16, 40 (Bankr. S.D.N.Y. 2015),[7] and, in certain circumstances, intangible assets like goodwill, *see Golden Distribs., Ltd. v. Reiss (In re Golden Distribs., Ltd.)*, 122 B.R. 15, 20 (Bankr. S.D.N.Y. 1990).

Charter asserts it did not violate § 362(a)(3) because its advertisements were not acts to "exercise control" over Windstream's "property."  In doing so it challenges (1) the bankruptcy court's conclusion that Windstream had executory contracts with its customers that constituted property protected by § 362(a)(3); (2) the bankruptcy court's reliance on "customer goodwill" as a property interest protected by § 362(a)(3); and (3) the bankruptcy court's conclusion that the advertisement constituted an act to "obtain" or "exercise control" over either of those two forms of protected property.

---

[7] "Executory contracts" refers to "contract[s] under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *ReGen Cap. I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 488 n.1 (2d Cir. 2008).

1.      **Executory Contracts**

Charter does not dispute that "Section 362(a)(3) clearly encompasses and protects a

debtor's executory contracts, which are property of the debtor's estate under 11 U.S.C. § 541."

(Order at 11.)  But it asserts that the Bankruptcy Court erred in determining that Windstream's

relationship with its subscribers was contractual, and more specifically that Windstream had a

protectible property interest in any such relationship.

Charter asserts that there is no evidence in the record of any contracts Windstream had

with customers.  The record before me is underdeveloped as to the specifics of the agreements

Windstream had with its customers.  At summary judgment, Windstream did not assert

interference with *contracts* as a basis for its assertion that Charter violated the automatic stay.

Rather, with regard to the advertisements in question, Windstream asserted only "that Charter

intentionally disseminated advertisements regarding Windstream's Chapter 11 cases, which

harmed Windstream's *goodwill* by falsely stating and implying that Windstream will not be able

to provide services and/or that Windstream will be going out of business."  (Bankr. Dkt. 123 at

32 (emphasis added).)[8]

Nevertheless, at summary judgment the Bankruptcy Court found that Charter's

advertising campaign was "an act to control property of the estate, namely, the debtors'

customers or contracts with those customers, which would also constitute a violation of the

---

[8] The only mention in the motion for summary judgment of an executory contract appears
in a partially redacted paragraph which seems to address Charter's disconnections of Windstream
customers in alleged breach of the parties' VAR Agreement, (*see* Bankr. Dkt. 123 at 32-34), an
issue that Charter does not appeal, (*see* Appellants' Mem. at 15 n.3).  I note that the parties, in
their designation of the record of appeal, have not provided the Court with unredacted docket
materials.  Nevertheless, Windstream does not argue that it claimed at summary judgment that
Charter's advertisements were acts of control over executory customer contracts or point to any
argument it made or record evidence it presented to the Bankruptcy Court on summary judgment
regarding the customer contracts it now alleges to be property subject to the automatic stay.

automatic stay." (SJ Hr'g at 152:7-14.)  In the Order, the Bankruptcy Court cited as evidence of

the contracts in question testimony from a Windstream employee that the "average tenure of a

customer is let's just say ballpark 50 months." (Order at 16 n.17, 19 n.24 (citing Bankr. Dkt. 328

at 39).) The witness did not, however, state that its customers remained with Windstream for an

average of 50 months because of any contract.

Windstream argues on appeal that it has both "term contracts and month-to-month

contracts," but does not elaborate which contracts it claims to have lost due to Charter's

advertisements. (ECF No. 24 ("Appellees' Opp.") at 22.)  As evidence of the existence of these

contracts, Windstream points to Charter's advertisement stating that "Windstream has a 2-year

contract," (*id.* at 25); a statement in Charter's Statement of Additional Facts in opposition to

Windstream's summary judgment motion that it had "bought out 32 contracts from Windstream

Customers in 2019" and a spreadsheet showing those contracts, (Bankr. Dkt. 158 ¶ 65; Bankr.

Dkt. 153-51); and a vague reference to "contract concessions" that Windstream argued it had to

offer to retain customers in the wake of Charter's advertising campaign, (SJ Hr'g at 67:24-25).

This evidence is quite thin.  It suggests that some kind of contractual relationship may

exist between Windstream and at least some of its subscribers, but does not reflect anything

about the terms and conditions of those contracts, their duration, or what performance was

required of either party to the contract.  Windstream argues that, in addition to the limited

evidence in the record, this Court can and should take judicial notice of the Terms and

Conditions on its website, which it represents were in effect at the time of the stay violation,

(Appellees' Opp. at 26 n.5), and to which it points as evidence that "all Windstream subscribers

are bound at least by month-to-month, *automatically* renewing contracts," (*id.* at 27 (emphasis in

original)).  But this Court must "limit [its] review to the record on appeal" and accordingly

cannot take judicial notice of evidence that was not presented to the trial court. *Pullman v. Alpha Media Publ'g, Inc.*, 624 F. App'x 774, 779 (2d Cir. 2015) (summary order); *see Int'l Bus. Machs. Corp. v. Edelstein*, 526 F.2d 37, 45 (2d Cir.1975) (*per curiam*) ("[A]bsent extraordinary circumstances, federal appellate courts will not consider rulings or evidence which are not part of the trial record.").[9]  Thus, to the extent that Windstream relies on those terms and conditions – for example, in arguing that all of its customers are at least covered by a month-to-month contract that is executory because the Terms and Conditions include "automatic renewal provisions that render the contracts continuous" – it fails to identify any evidence that this Court can properly consider to support that assertion.

The issue of whether Windstream had contracts with its customers is a question of fact reviewed for clear error.  I find that despite the lack of evidence regarding the specifics of the contracts in question, the Bankruptcy Court did not clearly err in concluding that Windstream had some kind of contracts under which it provided services to at least some customers.  This is supported by Charter's assertions that "Windstream has a two-year contract," (Bankr. Dkt. 341-6 at 2), and that it "bought out 32 contracts from Windstream customers," (*see* Bankr. Dkt. 158 ¶ 65).  While the fact that customers typically stay with Windstream for 50 months does not necessarily mean that they do so pursuant to a contract, that fact, combined with Charter's

---

[9] Windstream cites *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019), for the proposition that this Court may judicially notice the terms and conditions on its website and consider them for their truth, *i.e.*, as evidence of customer contracts.  But that case stands only for the proposition that the Court can consider representations or statements on a public website for the fact that they were made, not for their truth.  *Id.*; *see Dwyer v. Allbirds, Inc.*, No. 21-CV-5238, 2022 WL 1136799, at *4 (S.D.N.Y. Apr. 18, 2022) (matters of which a court can take judicial notice under Fed. R. Evid. 201 include "information on a party's publicly available website, as long as the authenticity of the site is not in dispute, but such information may be considered only for the fact that it was said, not for its truth").

concessions, could support an inference of the existence of either a term contract or some form of month-to-month contract that automatically renews.

On the legal question of whether such contracts are executory, Windstream points to case law to the effect that an automatically renewing contract does not end with the conclusion of the term, but rather is regarded as continuing until either party terminates. *See Pirinate Consulting Grp., LLC v. ERCO Worldwide (In re NewPage Corp.)*, 586 B.R. 551, 564 (Bankr. D. Del. 2018) (supply agreement between Chapter 11 debtor and non-debtor party that would renew automatically unless parties gave requisite notice of termination was executory contract for purposes of assumption); *In re Country Club Ests. at Aventura Maint. Ass'n*, 227 B.R. 565, 568 (Bankr. S.D. Fla. 1998) ("This Court adopts the majority position that a contract which is renewed pursuant to an automatic renewal provision is merely a continuation of the original contract. . . .  Therefore, the renewal period constitutes a continuation of the original prepetition executory contract . . . ."). These authorities are persuasive that an automatically renewing subscriber agreement, requiring notice of termination, would be an executory contract subject to the automatic stay.  But, as noted, there is an insufficient record basis to conclude that Windstream's customer contracts were the sort of automatically renewing contracts that would be considered executory and part of Windstream's property in bankruptcy.  In any case, I need not resolve this question definitively because, as I will explain, Charter's advertisements were not acts to "obtain" or "control" any such contracts.

### 2.    Goodwill

Charter also challenges the conclusion that goodwill constitutes property of the estate in this case.  As a general matter, as the Bankruptcy Court held, "Section 362(a)(3) protects a debtor's goodwill" as "property of the estate under 11 U.S.C. § 541(a)(1)."  (Order at 12.)  But,

as reflected by the authority cited by the Bankruptcy Court and Windstream, "goodwill" in this sense is typically tied to wrongful impersonation and/or involves goodwill associated with customer lists or trademarks.  *See Cyganowski v. Biolitec U.S. Inc. (In re Biolitec, Inc.)*, No. 13-11157, 2015 WL 351201, at *10 (Bankr. D.N.J. Jan. 22, 2015) (finding violation of automatic stay where, "despite the Court's finding and approval of the fact that the Debtor's customer information and goodwill belonged to the estate and were to be included in the sale of substantially all of the Debtor's assets to AngioDynamics, and its explicit prohibition against the use of such customer information by the affiliates of the Debtor, New Biolitec used the Debtor's customer information to contact the Debtor's customers and solicit sales"); *Phillips v. Diecast Mktg. Innovations, L.L.C. (In re Collecting Concepts, Inc.)*, No. 99-6003, 2000 WL 1191026, at *4 (Bankr. E.D. Va. Feb. 28, 2000) (protecting goodwill associated with debtor's trademark); *Merry Hull & Co. v. Hi-Line Co.*, 243 F. Supp. 45, 50 (S.D.N.Y. 1965) (same).  To the extent the advertising at issue here affected Windstream's goodwill in the marketplace, it did so not through misuse of intellectual property (like a trademark) or proprietary business information (like customer lists or trade secrets), but through forward-looking representations about Windstream's business prospects.  As I explain in detail below, Charter did not engage in any act that "exercised control" over any goodwill that is cognizable as a property interest.

### 3.    Control

Even assuming that Windstream had executory contracts with its customers, and that its goodwill in the marketplace is protected by the automatic stay, Charter did not violate the automatic stay unless its advertisements were "an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C.

§ 362(a)(3).  The plain language of this statute does not clearly encompass solicitation of a debtor's customers, which one does not typically regard as "exercising control" over "property."

The Bankruptcy Court acknowledged that advertising alone does not violate the automatic stay, but nevertheless held that "[a]lthough every corporation expects legitimate advertising by competitors, and thus such advertising does not 'exercise control' over its property, improper advertising such as the Defendants' clearly and objectively interfered with the Debtors' customer contracts and goodwill and thus clearly was precluded by section 362(a)(3)'s plain terms and the caselaw applying them."  (Order at 19-20.)  But there is nothing in the "plain terms" of § 362(a)(3) that suggests that "improper" advertisements are methods of "control" but "legitimate" ones are not.  While the automatic stay is to be "liberally interpreted," *Suh v. Anderson (In re Moo Jeong)*, No. 19-1244, 2020 WL 1277575, at *6 (B.A.P. 9th Cir. Mar. 16, 2020), such an interpretation cannot stretch the statutory text beyond its meaning.  The statute does not prohibit all conduct that harms or interferes with a debtor's business, but only that which amounts to an effort to obtain or control estate property.

As to the whether the case law permits such a broad interpretation of § 362(a)(3), the Bankruptcy Court was correct as a general proposition that "section 362(a)(3) stays acts that impair, interfere with or destroy the estate's interest in contracts or goodwill."  (Order at 12.)  But it cannot stay all such acts, or any attempt to compete with an entity going through reorganization would be stayed, whether wrongful or not.  The cases cited by the Bankruptcy Court shed light on the kinds of acts that can be said to "impair" or "interfere" with estate property such that that they can plausibly amount to the "exercise [of] control."  Several involve litigation or other legal action that would, or did, indirectly destroy or transfer control of the debtor's property.  *See e.g.*, *ACandS, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260-61 (3d

Cir. 2006) (arbitration award that effectively terminated debtor's insurance coverage); *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 392 (2d Cir. 1996) (trademark litigation against non-debtor sublicensee of debtor licensor); *48th St. Steakhouse, Inc. v. Rockefeller Grp., Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 430-31 (2d Cir. 1987) (termination of non-debtor's lease, which also terminated debtor's sublease); *In re Extraction Oil & Gas, Inc.*, No. 20-11548, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020) (litigation to enjoin non-debtors' fulfillment of contract with debtor).  While these cases stand for the proposition that even acts aimed at a non-debtor may impact the property interests of the estate and thus violate the automatic stay, the advertising at issue in this case, which sought to influence consumer choice, is clearly distinguishable from legal actions which would have the downstream effect of altering a debtor's interest in real property, commercial contracts, or insurance contracts.  Other cases cited by the Bankruptcy Court involved the use of trade secrets or confidential/proprietary information, *see Corp. Claims Mgmt., Inc. v. Shaiper (In re Patriot Nat'l Inc.)*, 592 B.R. 560, 571 (Bankr. D. Del. 2018); *In re Biolitec, Inc.*, 2015 WL 351201, at *10; *In re Collecting Concepts, Inc.*, 2000 WL 1191026, at *4, neither of which are at issue here.

Charter does not dispute that its advertisements were an attempt to influence customer behavior:  they publicized Windstream's bankruptcy, suggested that Windstream's customers might lose service as a result of the bankruptcy, and proposed their own service as an alternative.  But even if this conduct violated other, non-bankruptcy law (an issue I need not and do not resolve in this opinion), it is not clear how it was an act to "exercise control" over contracts or goodwill.  Windstream posits that "false and misleading advertising subverts the customer's decision-making, allowing the liar to exercise control by manipulating the consumer." (Appellees' Opp. at 35.)  But even advertising that is not false or misleading can be, and often is,

manipulative.  And in any case, the customer is not property of the estate.  It is thus difficult to see how, without more, influencing or manipulating a customer to opt for a competitor's service over a debtor's through advertisements, false or otherwise, is an act of control over estate property.

The mere fact that the conduct may be wrongful or unlawful does not automatically convert it into a violation of the automatic stay.  *In re Golden Distributors*, in which the debtor raised similar arguments, illustrates the point.  There, the debtor sought a temporary restraining order and preliminary injunction under § 362(a)(3) against former employees who were allegedly soliciting the debtor's customers in violation of non-compete agreements.  *See* 122 B.R. at 16-17. The court held that "the fact that the defendants may have breached the restrictive covenants in their employment contracts or that they may have improperly solicited the debtor's customers, for which the defendants might ultimately be liable to the debtor for damages or enjoined from engaging in such improper conduct, does not mean that the defendants attempted to obtain possession or control of property of the estate in violation of 11 U.S.C. § 362(a)(3)."  *Id.* at 19-20.  Rather, absent a contract that bound the customers to purchase exclusively from the debtor or required those customers to purchase specific quantities of products, the former employees did not breach the stay by competing for those customers.  *Id.* at 20.  And as to goodwill, the court observed that "[t]here was no evidence that the defendants sought to continue the debtor's business or hold themselves out as related in any way to the debtor's business so as to acquire the good will that was associated with such business."  *Id.* at 20.  The same is true here, as Charter's advertisements were clearly mailings from a competitor.

By contrast, in *Alert Holdings, Inc. v. Interstate Protective Services (In re Alert Holdings)*, 148 B.R. 194 (Bankr. S.D.N.Y. 1992), cited by Windstream and the Bankruptcy

Court, the court held that a competitor of the debtors (who were in the business of monitoring and servicing alarm systems) violated the automatic stay when it told the debtors' accountholders (who had term contracts) that the debtors were going out of business and that the competitor had been designated to take over their accounts, and sent representatives to the customers' homes to switch their service. *Id.* at 197-98. When customers began receiving bills from both the debtors and the competitor, and the debtors attempted to correct the misconceptions caused by the competitor, the competitor sent another mailing telling the customers that their contracts with the debtors were unenforceable and offering legal assistance to anyone who had legal issues with the debtors over canceling their contract. *Id.* at 198. These acts, through which the competitor actively sought to convert or override exclusive term contracts between debtors and their customers, by using the debtors' customer list and holding itself out as the proper and authorized servicer of those accounts, are properly characterized as attempts to exercise control. Such conduct is clearly distinguishable from Charter's mailing campaign here, which involved no proprietary information and in which Charter did not misrepresent its identity.

In short, Charter's advertisements cannot reasonably be seen as an act to exercise control over property of Windstream's estate. Accordingly, this conduct did not violate the automatic stay under 11 U.S.C. § 362(a)(3).

**B.**     **Whether the Bankruptcy Court Erred in Holding Charter in Contempt**

Even if Charter's conduct violated the automatic stay, the Bankruptcy Court abused its discretion in concluding that there was no fair ground of doubt as to whether the advertisements were a violation of the automatic stay.

While the bankruptcy code provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages," 11 U.S.C. § 362(k)(1),

under Second Circuit precedent this provision is inapplicable to corporate debtors like

Windstream.  *See Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*,

920 F.2d 183, 186-87 (2d Cir. 1990).  For corporate debtors, "contempt proceedings are the

proper means of compensation and punishment for willful violations of the automatic stay."  *Id.*

at 187.  Courts have identified 11 U.S.C. § 105(a), under which a bankruptcy court may "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title," as a source of authority to issue sanctions for willful violations of the automatic stay.  *See*

*Feltman v. Wells Fargo Bank, N.A. (In re TS Emp., Inc.)*, 597 B.R. 494, 536 (Bankr. S.D.N.Y.

2019); *Bartel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 171 B.R. 18, 21 (S.D.N.Y. 1994).[10]

In 2019, the Supreme Court addressed bankruptcy courts' civil contempt power under

§ 105(a), albeit in the context of a violation of a bankruptcy discharge order, not a violation of

the automatic stay.  *See Taggart*, 139 S. Ct. 1795.  In *Taggart*, the Court held that § 105(a) and

11 U.S.C. § 524 (the latter of which "operates as an injunction against the commencement or

continuation of an action, the employment of process, or an act, to collect, recover or offset a

discharged debt") together "authorize a court to impose civil contempt sanctions when there is no

objectively reasonable basis for concluding that the creditor's conduct might be lawful under the

discharge order" – that is, where there is "*no fair ground of doubt* as to whether the order barred

the creditor's conduct."  *Taggart*, 139 S. Ct. at 1799, 1801 (cleaned up) (emphasis in original).

---

[10] To the extent that Charter questions the Bankruptcy Court's authority to issue sanctions
under § 105(a), the Court rejects that argument.  While the Supreme Court held "that § 105(a)
does not allow the bankruptcy court to override explicit mandates of other sections of the
Bankruptcy Code," *Law v. Siegel*, 571 U.S. 415, 421 (2014) (cleaned up), there is no explicit
mandate that bankruptcy courts cannot issue contempt sanctions for automatic stay violations
with regard to corporate debtors.  The mere fact that § 362(k) addresses only individual debtors
and is silent as to corporate debtors is not an explicit mandate that corporate debtors cannot be
sanctioned for violations of the stay, and thus that provision is not "overridden" by the use of §
105(a) to enforce the stay as it applies to non-individual debtors.

"This standard reflects the fact that civil contempt is a severe remedy and that principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt." *Id.* at 1802 (cleaned up).  Both parties and the Bankruptcy Court agreed that *Taggart* is relevant to this case.  (*See* Order at 6-8; Appellants' Mem. at 23; Appellees' Opp. at 50-53.)

In discussing the application of *Taggart* to violations of the automatic stay, the Bankruptcy Court noted that, given the interests in administration of the estate that the automatic stay protects, "it is logical to require those in doubt whether the stay applies to seek clarification from the court or be sanctioned for shooting first and aiming later."  (Order at 7-8.)  This observation echoes that of courts in this Circuit discussing the standard applicable to individual debtors under § 362(k), under which "any deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages."  *Crysen/Montenay Energy Co. v. Esselen Assocs. (In re Crysen/Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2d Cir. 1990); *see In re Congregation Birchos Yosef*, 535 B.R. 629, 635 (Bankr. S.D.N.Y. 2015) ("'This standard encourages would-be violators to obtain declaratory judgments before seeking to vindicate their interests in violation of an automatic stay, and thereby protects debtors' estates from incurring potentially unnecessary legal expenses in prosecuting stay violations.'  That is, Congress intended in § 362 to prevent self-help, or shooting first and aiming later.") (quoting *In re Crysen/Montenay Energy*, 902 F.2d at 1105).  Under this standard, "so long as the violator possessed general intent in taking actions which have the effect of violating the automatic stay,

the intent requirement of § 362[(k)] is satisfied." *Sucre v. MIC Leasing Corp. (In re Sucre)*, 226

B.R. 340, 346 (Bankr. S.D.N.Y. 1998) (cleaned up).

The bankruptcy court in *Taggart* proposed, and the Supreme Court rejected, a

substantially similar standard under § 105(a), which "would permit a finding of civil contempt if

the creditor was aware of the discharge order and intended the actions that violated the order."

*Taggart*, 139 S. Ct. at 1803.  The Court characterized this standard as "akin to strict liability"

because "most creditors are aware of discharge orders and intend the actions they take to collect

a debt."  *Id.*  And while acknowledging the argument that such a standard was not unfair to

creditors, who could always "head to federal bankruptcy court and obtain an advance

determination on that question before trying to collect the debt" if they were uncertain whether

their course of action would violate the discharge order, the Court was skeptical of this

procedure:

> We doubt, however, that advance determinations would provide a workable
> solution to a creditor's potential dilemma.  A standard resembling strict liability
> may lead risk-averse creditors to seek an advance determination in bankruptcy
> court even where there is only slight doubt as to whether a debt has been
> discharged.  And because discharge orders are written in general terms and
> operate against a complex statutory backdrop, there will often be at least some
> doubt as to the scope of such orders.  Taggart's proposal thus may lead to frequent
> use of the advance determination procedure.

*Id.*  The strict liability proposal would "risk additional federal litigation, additional costs, and

additional delays" that "would interfere with a chief purpose of the bankruptcy laws:  to secure a

prompt and effectual resolution of bankruptcy cases within a limited period."  *Id.* (cleaned up).

Some of the same concerns are present here:  a standard that requires creditors to move to

lift the stay, lest they be held strictly liable for an action determined to violate the stay, would

generate more lift-stay motions.  Further, § 362(a)(3) – which enjoins "any act to obtain

possession of property of the estate or of property from the estate or to exercise control over

property of the estate" – is similar to the discharge orders discussed in *Taggart* in that it is
"written in general terms and operate[s] against a complex statutory backdrop."  *Id.*

Despite these similarities, aspects of *Taggart* focus on concerns that are specific to
discharges and inapplicable to the automatic stay.  The Court explicitly acknowledged the
differences between stay violations and discharge violations and acknowledged that the "aware
of and intended to violate" standard was applied by lower courts in the context of § 362(k):

> An automatic stay is entered at the outset of a bankruptcy proceeding.  The
> statutory provision that addresses the remedies for violations of automatic stays
> says that "an individual injured by any willful violation" of an automatic stay
> "shall recover actual damages, including costs and attorneys' fees, and, in
> appropriate circumstances, may recover punitive damages."  This language,
> however, differs from the more general language in section 105(a).  The purposes
> of automatic stays and discharge orders also differ:  A stay aims to prevent
> damaging disruptions to the administration of a bankruptcy case in the short run,
> whereas a discharge is entered at the end of the case and seeks to bind creditors
> over a much longer period.  These differences in language and purpose
> sufficiently undermine Taggart's proposal to warrant its rejection.

*Id.* at 1803-04 (quoting 11 U.S.C. § 362(k)(1)).

The question here is whether – given controlling precedent in this circuit that § 105(a),
not § 362(k)(1), is the source of the bankruptcy court's authority to issue civil contempt
sanctions for violations of the automatic stay with regard to a corporate debtor – requiring a party
in Charter's position to seek clarification, through a motion to lift the automatic stay, is
consistent with *Taggart*.  While *Taggart* indicates that the "no fair ground of doubt" standard,
which includes no such requirement, should apply whenever a bankruptcy court issues civil
contempt sanctions under § 105(a), the Court's discussion of the differences between the
discharge order and the automatic stay might suggest that a more debtor-friendly standard than
the *Taggart* standard – one requiring a motion to lift the stay – is appropriate, as the Bankruptcy
Court believed and for which Windstream argues.

Notwithstanding the differences between the discharge injunction and the automatic stay, it is contrary to *Taggart* to read into § 105(a) a requirement that a creditor "seek clarification from the court or be sanctioned for shooting first and aiming later" if the creditor is unsure whether its contemplated course of conduct would run afoul of the automatic stay. *See Harker v. Eastport Holdings, LLC (In re GYPC, Inc.)*, 634 B.R. 983, 991 (Bankr. S.D. Ohio 2021) ("*Taggart* fundamentally is contrasting § 362(k), a congressionally approved private right of action for individuals, and the separate and more general language under § 105 supporting contempt proceedings. As Congress has chosen to limit any private right of action for stay violations to those against individuals, the court believes it must apply *Taggart* to § 105 contempt actions not covered by § 362(k) (or another private right of action)."). In so deciding, this Court is bound by both the *Taggart* Court's holding with regard to §105(a) and binding Second Circuit authority on § 362(k)'s application to corporate debtors. Because, under *In re Chateaugay*, the Bankruptcy Court's source of authority for the sanctions at issue on this appeal is § 105(a), the Court is bound to follow the Supreme Court's interpretation of that provision, under which there is no requirement that the would-be violator move to lift the stay prior to acting. *Taggart*, 139 S. Ct. at 1803. Accordingly, to the extent the Bankruptcy Court relied on such a rule, (*see* Order at 18-19 (citing Charter's failure to note a case's "clear guidance that if a party doubts section 362(a)'s applicability to their conduct, they should seek relief from the automatic stay under 11 U.S.C. § 362(d))"), it erred in doing so.[11]

    Further, the Bankruptcy Court's conclusion that there could have been objectively "no fair ground of doubt" on Charter's part that its advertisements would violate the automatic stay

---

[11] There might be some logic to the argument that, as a matter of policy, the less debtor-friendly *Taggart* standard should not apply to violations of the automatic stay as it does to violations of a discharge order. But this Court cannot make policy.

was outside the permissible range of decisions and thus an abuse of discretion.  The Bankruptcy Court's conclusion that Charter's advertising campaign "exercises control" over estate property is at least highly debatable.  The plain language of the automatic stay does not clearly proscribe the conduct here, as advertising (even misleading advertising) is not typically understood to exercise control over property.  Even if I were to accept the theory of the stay violation here – that because the advertisements were false, they were improperly influential – it is not an objectively obvious reading of the statute or the caselaw.

Particularly under the more searching standard that I must apply in assessing sanctions awarded under 11 U.S.C. § 105(a), *see In re Blair Ventures*, 581 B.R. at 732, the Bankruptcy Court abused its discretion in holding Charter in civil contempt.

IV.   **<u>CONCLUSION</u>**

For the foregoing reasons, the portion of the Bankruptcy Court's Judgment holding Charter in contempt for violation of the automatic stay based on Charter's advertisements and sanctioning it in the amount of $19,179,329.45 for that violation is VACATED.  The Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated: October 6, 2022
      White Plains, New York

                                       CATHY SEIBEL, U.S.D.J.